JOHN REYNOLDS
121 N Cactus Ave
Rialto, Ca. 92376
(909)697-7635
info@inlandvalleyautomall.com
Plaintiff in Pro Se



FILED
CLERK, U.S. DISTRICT COURT

AUG 19 2025

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION BY DEPUTY

FEE PAID

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOHN REYNOLDS, an individual engaged

in dealer inspection preparation services,

EDCV25-02163-HDV (RAO)

Plaintiff,

v.

STEVE GORDON, DMV Director,

individually and in his official capacity;

LARRY MCKENZIE, DMV Inspector,

individually and in his official capacity;

DIANE STARNGE, DMV Manager;

individually and in her official capacity;

DAISY PONSE, DMV Inspector,

individually and in her official capacity;

and DOES 1-10, inclusive, et al,

Defendants

Case No.: _____

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

Civil Rights Action Under 42U.S.C. §
1983

[JURY TRIAL DEMANDED]

Reynolds v. Gordon, et al. - 1

TO THE HONORABLE JUDGES OF THIS COURT:

Plaintiff John Reynolds, appearing in propria persona, respectfully submits this Complaint for Declaratory and Injunctive Relief against Defendants, state officials of the California Department of Motor Vehicles, and alleges as follows:

## I: INTRODUCTION

1. This civil rights action under 42 U.S.C. § 1983 seeks prospective declaratory and injunctive relief to halt a systematic, department-level policy that—beginning June 2025—directs DMV field inspectors to predetermined denial of dealer facility inspections using unpublished criteria, secret management directives, and arbitrary interpretations that deny regulated parties fair notice, meaningful process, and equal treatment under law.

2. Defendants operate a two-stage system wherein Sacramento Occupational Licensing analysts first approve documentation and facility plans under published regulations, then field inspectors systematically fail those same compliant facilities using unpublished criteria, secret management directives, and novel interpretations not found in any published standard. This approve-then-deny pattern violates the Fair Warning Doctrine established in Lambert v. California (1957) 355 U.S. 225, which requires that individuals have fair notice of what conduct is prohibited before government may impose sanctions. Defendants' use of shifting, unpublished criteria makes compliance impossible regardless of actual adherence to written regulations, denying regulated parties procedural due process under the Fourteenth Amendment. 4. Under the Ex Parte Young doctrine, federal courts have jurisdiction to enjoin state officials from ongoing violations of federal law, notwithstanding Eleventh Amendment immunity. Ex Parte Young (1908) 209 U.S. 123. The three-part test for such jurisdiction requires: (1) an ongoing violation of federal law,

(2) by a state official, (3) where prospective injunctive relief is sought rather than monetary damages from the state treasury. All elements are satisfied here: Defendants are state DMV officials systematically violating Plaintiff's constitutional rights through predetermined denials using unpublished criteria, and Plaintiff seeks only prospective injunctive relief to halt these ongoing violations and restore lawful inspection procedures.

3. Plaintiff John Reynolds is not IVAM's managing member. He is an individual whose livelihood depends on the lawful completion of inspections: he prepares offices, signage, and display areas and is compensated upon successful inspection outcomes. When compliant inspections are failed under this policy, he sustains direct, personal economic injury (lost success compensation and lost ongoing work). He sues in his individual capacity for prospective injunctive relief to stop the policy. Plaintiff does not seek to guarantee regulatory approval outcomes or substitute judicial judgment for agency expertise, but seeks restoration of constitutional processes that provide fair notice, meaningful opportunity to achieve compliance, and consistent application of published standards.

4. Eleventh Amendment Immunity Analysis:
The Eleventh Amendment does not bar this suit because: (1) Plaintiff seeks purely prospective relief against state officers in their official capacities under Ex parte Young, 209 U.S. 123 (1908), to end ongoing violations of federal law; (2) the systematic predetermined denial policy creates fresh constitutional violations with each inspection conducted under secret criteria; (3) no retrospective relief or damages are sought from the state treasury for official capacity claims; and (4) individual defendants are sued in their personal capacity for damages resulting from their individual participation in clearly established constitutional violations.

5. Ex Parte Young Three-Part Test Satisfaction:

This lawsuit seeks to end an ongoing violation of federal law by state officers acting in their official capacities. Under Verizon Md. Inc. v. Pub. Serv. Comm'n, 535 U.S. 635, 645 (2002), and Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, 276-77 (1997), federal courts retain jurisdiction to enjoin continuing constitutional violations by state officials when: (1) the complaint alleges ongoing violations of federal law, (2) the relief sought is prospective, and (3) the suit is properly directed against state officers in their official capacity for injunctive relief only. Each element is satisfied here through Defendants' continuing enforcement of secret criteria violating due process notice requirements, systematic predetermined denial policies violating procedural fairness, and targeted enforcement violating equal protection.

## I. PARTIES, JURISDICTION, AND VENUE

6. Plaintiff JOHN REYNOLDS is an individual resident of California who operates as an automotive dealer compliance consultant, providing regulatory compliance guidance and inspection preparation services to licensed automotive dealers. Plaintiff has suffered direct, immediate economic injury from Defendants' systematic shift to unpublished regulatory criteria and predetermined denial policies as detailed herein.


7. Defendant STEVE GORDON is the Director of the California Department of Motor Vehicles and is sued in his official capacity for injunctive and declaratory relief.

8. Relief Sought Distinction - Official vs. Personal Capacity:
Against official capacity defendants (Steve Gordon), Plaintiff seeks only prospective declaratory and injunctive relief requiring adherence to published regulatory standards—no monetary damages from the state treasury. Against individual capacity defendants (Strange, McKenzie, Ponse), Plaintiff seeks both prospective relief and personal

monetary damages for their individual participation in systematic constitutional violations exceeding lawful authority. This distinction preserves Ex parte Young applicability while maintaining individual accountability under Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 n.10 (1989).

9. Defendant DIANE STRANGE is the Regional Manager responsible for implementing and coordinating the systematic denial policy at the field level. Strange has made direct admissions regarding arbitrary enforcement standards and acknowledged the predetermined nature of inspection failures. She is sued in her individual and official capacity for damages and injunctive relief.

10. Individual Capacity - Qualified Immunity Defeated (Strange):
Defendant Strange is sued in her individual capacity for personal monetary damages resulting from her systematic constitutional violations that exceeded any reasonable interpretation of regulatory authority. Under Harlow v. Fitzgerald, 457 U.S. 800 (1982), qualified immunity requires: (1) whether defendant's conduct violated constitutional rights, and (2) whether rights were clearly established. Both prongs are satisfied here. Strange's personal knowledge of constitutional violations through her July 7, 2025 face-to-face acknowledgment of "predetermined failures" and systematic non-response to documented constitutional violations demonstrates willful indifference to clearly established due process rights. No reasonable regional manager could believe that acknowledging predetermined outcomes while continuing to implement them satisfied constitutional requirements established in Goldberg v. Kelly, 397 U.S. 254 (1970).

11. Individual Capacity - Qualified Immunity Defeated (McKenzie): Defendant McKenzie's June 25, 2025 smoking gun confession—"management has instructed me to fail all inspections at Cactus due to delineation" [See Declaration of John Reynolds ¶6]—establishes actual knowledge that his conduct violated clearly established constitutional

rights. McKenzie explicitly admitted that inspection outcomes were predetermined by management directive rather than regulatory compliance assessment, stating "we will automatically fail the inspection of the dealer" and confirming he was "on orders from management to fail all inspections at Cactus due to delineation" [See Declaration of John Reynolds ¶9]. His reliance on a management email containing predetermined violation codes rather than published regulatory standards [See Declaration of John Reynolds ¶10] demonstrates conscious disregard for constitutional requirements. This confession, witnessed by independent observer Brian Reynolds via timestamped speakerphone call and preserved in cell phone records [See Declaration of John Reynolds ¶¶8, 11, 12], establishes McKenzie's subjective awareness that predetermined denial policies violated due process rights. No reasonable official could believe that systematically denying inspections based on management directives rather than regulatory compliance satisfies constitutional requirements. McKenzie's August 6, 2025 additional admissions—including "In my eye, Yes" (acknowledging compliance) followed by predetermined failure—further confirm his knowledge that the denial scheme violated clearly established law [See Regina Kerr Declaration ¶5]. The combination of explicit confessions of management directives, documentary evidence of predetermined codes, and independent witness corroboration establishes that McKenzie acted with deliberate indifference to constitutional rights, defeating any qualified immunity defense under the objective reasonableness standard established in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).

12. McKenzie submitted his resignation to the California DMV effective September 1, 2025. McKenzie represents substantial flight risk as he plans to use accrued vacation time during the final two weeks of August 2025, making immediate service of process critically urgent. His resignation creates urgency for testimony preservation and service of process.

13. Defendant INSPECTOR PONSE is a DMV Field Inspector who has coordinated with McKenzie in implementing the systematic denial policy and has used identical "automatic fail" declarations during inspections. Ponse has been transferred from inspection duties, creating urgency for service of process and testimony preservation. He is sued in his individual and official capacity for damages and injunctive relief.

14.  Individual Capacity - Qualified Immunity Defeated (Ponse):
Defendant Ponse's coordinated systematic implementation with McKenzie, using identical "automatic fail" declarations across different facilities, demonstrates institutional knowledge of constitutional violations. Under Village of Willowbrook v. Olech, 528 U.S. 562 (2000), systematic targeting without rational basis violates clearly established equal protection rights. Ponse's immediate transfer from inspection duties upon exposure of systematic violations indicates awareness that his conduct was constitutionally indefensible. No reasonable inspector could coordinate systematic predetermined failures while believing such conduct satisfied constitutional due process requirements clearly established by 2025. [See Declaration of Regina Kerr, ¶17], [See Declaration of John Reynolds, ¶¶12, 15, 18], [See Declaration of Brian Reynolds, ¶¶10, 13, 16]

15. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) as this action arises under federal civil rights laws, specifically 42 U.S.C. § 1983.

16. Federal Question Jurisdiction Foundation:
This case presents pure questions of federal constitutional law requiring no interpretation of state regulatory provisions. Resolution depends entirely on whether government agencies may: (1) enforce secret, unpublished regulatory criteria in violation of Fourteenth Amendment Due Process, and (2) systematically target particular business groups in violation of Equal Protection. Under Will v. Michigan Dep't of State Police,

491 U.S. 58, 71 n.10 (1989), such constitutional challenges create federal question
jurisdiction under 28 U.S.C. § 1331. The constitutional violations alleged are
distinguishable from generalized grievances in Valley Forge Christian College v.
Americans United, 454 U.S. 464 (1982), and broad institutional reform claims in Allen v.
Wright, 468 U.S. 737 (1984), because they seek relief against specific regulatory policies
affecting Plaintiff's particularized business interests.

17. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part
of the events occurred at DMV-inspected facilities in San Bernardino and Riverside
Counties, within the Central District of California.

ENHANCED CAUSATION AND TRACEABILITY

18. Immediate Injury Upon Policy Implementation: Plaintiff's injuries are concrete,
particularized, and immediately traceable to Defendants' June 2025 policy shift without
regard to third-party decisions or dealer outcomes. Unlike derivative injury claims that
depend on independent choices by regulated entities, Plaintiff's harm flows directly and
automatically from Defendants' adoption of unpublished criteria that make contractual
service performance impossible, capital investments worthless, professional reputation
damaged, and regulatory expertise obsolete.

19. But-For Causation Documentation:
But for Defendants' shift to predetermined denials and secret criteria, Plaintiff could
continue performing contracted compliance services, facility investments would retain
value, professional reputation would remain intact, and regulatory expertise would
remain marketable. No intervening causes or dealer decisions affect these injury
streams—the harm is immediate upon policy implementation and independent of dealer
compliance levels, inspection outcomes, or business relationships between Plaintiff and
individual dealers.

20. Elimination of Third-Party Dependency:

Plaintiff's injuries eliminate the "third-party derivative" problem because they occur immediately upon policy implementation regardless of: (1) whether dealers succeed or fail in obtaining licenses; (2) whether dealers maintain business relationships with Plaintiff; (3) whether dealers comply with published or unpublished standards; or (4) market conditions affecting dealer licensing demand. These injuries are direct to Plaintiff's business assets and contractual obligations, not mediated through dealer decisions or regulatory outcomes.

## QUANTIFIED ECONOMIC INJURY DOCUMENTATION

21. Quantified Direct Economic Losses:

Plaintiff operates as an automotive dealer compliance consultant through multiple direct economic relationships that create immediate, non-derivative injury upon Defendants' policy implementation. Plaintiff's business model generates income through four independent streams that are immediately harmed by Defendants' June 2025 shift to unpublished, secret regulatory criteria, as evidenced by McKenzie's confession that "management has instructed me to fail all inspections at Cactus" [See Declaration of John Reynolds ¶6]: (1) guaranteed monthly compensation for compliance maintenance services regardless of inspection outcomes; (2) personal capital investments in facility improvements; (3) professional reputation and market position in specialized regulatory compliance market; and (4) accumulated regulatory expertise and knowledge assets developed over six years of successful practice. McKenzie's admission that inspections would "automatically fail" regardless of compliance [See Declaration of John Reynolds ¶9] directly undermines each economic stream by making Plaintiff's regulatory expertise worthless when outcomes are predetermined by management directive rather than actual compliance assessment.

22. Contract Performance Incapacity - Direct Injury Stream #1: Plaintiff receives $12,500 monthly under the IVAM Master Services Agreement (executed January 15, 2024) for "regulatory compliance maintenance services," including monthly facility audits against published CCR standards, maintenance of compliant office configurations, signage compliance monitoring, and documentation system updates. This compensation is not contingent on inspection outcomes but on maintaining compliance with published regulatory standards. Defendants' shift to unpublished, secret criteria beginning June 2025, as evidenced by McKenzie's confession that "management has instructed me to fail all inspections at Cactus" [See Declaration of John Reynolds ¶6], made Plaintiff's contractual obligations impossible to fulfill. McKenzie's admission that facilities would "automatically fail" regardless of actual compliance [See Declaration of John Reynolds ¶9] and his reliance on a management email containing predetermined violation codes rather than published regulations [See Declaration of John Reynolds ¶10] prove that Plaintiff cannot maintain compliance with standards that are unknown, contradictory to published regulations, and applied through predetermined denial policies. The systematic elimination of regulatory predictability destroys Plaintiff's ability to perform contractual compliance maintenance services based on knowable legal standards.

23. Capital Investment Destruction - Direct Injury Stream #2:
Following Inspector McKenzie's June 25, 2025 confession that "management has instructed me to fail all inspections at Cactus due to delineation" [See Declaration of John Reynolds ¶6], Plaintiff personally invested $127,000 in constructing sixteen individual private offices across IVAM facilities, reasonably believing that private offices would satisfy DMV's separation requirements under published CCR § 270.00 standards. McKenzie's August 6, 2025 admission that the facilities met requirements "In my eye, Yes" yet were failed anyway due to management directives proves that Plaintiff's investment was destroyed by predetermined denial policy rather than actual non-compliance [See Regina Kerr Declaration ¶5]. The subsequent 100% failure rate for these

private office inspections, combined with McKenzie's confession that outcomes were predetermined regardless of regulatory compliance, proves that Plaintiff's capital investment was destroyed not by dealer non-compliance or market forces, but by Defendants' systematic denial policy that renders compliance impossible regardless of actual adherence to published standards [See Declaration of John Reynolds ¶9].

24. Professional Reputation Damage - Direct Injury Stream #3:
Plaintiff's professional reputation in the specialized automotive dealer compliance market constitutes a quantifiable business asset independent of any specific dealer relationship. The systematic failure pattern—100% failure rate across 64 inspections from June-August 2025 despite full compliance with published standards—destroyed Plaintiff's professional credibility and market position through no fault of Plaintiff's professional competence. McKenzie's confession that "management has instructed me to fail all inspections at Cactus" proves that the unprecedented failure pattern resulted from government misconduct rather than Plaintiff's professional deficiencies [See Declaration of John Reynolds ¶6]. McKenzie's admission that facilities met requirements "In my eye, Yes" yet were failed due to management directives demonstrates that Plaintiff's professional services were effective, but outcomes were predetermined regardless of compliance quality [See Regina Kerr Declaration ¶5]. TextLine communications document dealers questioning Plaintiff's competence and terminating consulting relationships based on the systematic failure pattern, directly damaging Plaintiff's ability to attract new clients and maintain existing professional relationships despite the failures being caused by Defendants' predetermined denial policy rather than professional inadequacy.

25. Regulatory Expertise Devaluation - Direct Injury Stream #4:
Plaintiff's six years of compliance expertise, representing substantial investment in regulatory knowledge and established relationships, became worthless when Defendants

shifted to secret, contradictory standards beginning June 2025. McKenzie's confession that "management has instructed me to fail all inspections at Cactus" demonstrates that Plaintiff's regulatory expertise became irrelevant when outcomes were predetermined by management directive rather than actual compliance assessment [See Declaration of John Reynolds ¶6]. DMV had repeatedly approved identical configurations that Plaintiff designed and implemented from 2017-May 2025, creating reasonable reliance interests in the stability of published regulatory standards. McKenzie's August 6, 2025 admission that facilities met requirements "In my eye, Yes" confirms that Plaintiff's expertise was professionally sound, but became worthless when inspections were predetermined to fail regardless of compliance quality [See Regina Kerr Declaration ¶5, 25]. The systematic contradiction between Sacramento analyst approvals and field inspector denials, combined with McKenzie's reliance on management email with predetermined codes rather than Plaintiff's regulatory expertise, created a regulatory trap where Plaintiff's knowledge—his primary business asset—was rendered obsolete regardless of actual compliance with published requirements [See Declaration of John Reynolds ¶10].

26.. Economic analysis establishes Plaintiff's direct economic injuries totaling $627,000: (1) Breach of Performance Capability: $75,000 (June-August 2025 period of impossible service performance); (2) Sunk Capital Investment: $127,000 (private office construction rendered worthless); (3) Professional Reputation Damage: $245,000 (lost market position value documented through comparable professional service business analysis); and (4) Regulatory Expertise Devaluation: $180,000 (six-year investment in compliance knowledge made obsolete by secret criteria adoption).

27. Immediate and Ongoing Harm:
These injuries are not speculative future losses but immediate, quantifiable harm occurring upon Defendants' policy implementation in June 2025. Plaintiff's contractual service obligations became impossible to fulfill immediately upon DMV's adoption of

secret criteria; capital investments lost value immediately upon demonstration that
compliance with published standards no longer ensures regulatory approval; professional
reputation suffered immediate damage upon unprecedented 100% failure rate despite
compliance; and regulatory expertise became immediately worthless upon DMV's
abandonment of published standards in favor of predetermined denial
policies.

28. Separation of Powers Compliance:
Plaintiff seeks prospective relief requiring constitutional process restoration, not
regulatory outcome guarantees or substitution of judicial judgment for agency expertise.
Under Youngberg v. Romeo, 457 U.S. 307 (1982), federal courts may order government
agencies to follow constitutional processes while respecting agency discretion within
constitutional boundaries. The requested relief preserves Defendants' regulatory authority
over individual licensing decisions while requiring adherence to constitutional baseline
requirements of notice, consistency, and procedural fairness. This relief falls within core
judicial competence to interpret and enforce constitutional requirements without
intruding upon legitimate regulatory expertise or policy judgments reserved to the
executive branch.

29. Continuing Constitutional Violations:
The predetermined denial policy creates ongoing constitutional harm with each
inspection. Unlike discrete past violations, Defendants' institutional policy systematically
violates federal law on a daily basis through: (1) enforcement of secret criteria violating
due process notice requirements, (2) predetermined outcomes violating procedural
fairness, and (3) systematic targeting violating equal protection. Each future inspection
under this policy constitutes a fresh federal law violation requiring prospective judicial
intervention. This continuing violation doctrine distinguishes the case from completed

regulatory disputes and establishes the ongoing nature of federal law violations necessary

for Ex parte Young jurisdiction.

30. Institutional Bad Faith:

The systematic use of "unknown management actors" to direct field-level constitutional

violations while keeping inspectors uninformed establishes institutional bad faith under §

1983. McKenzie's June 25, 2025 confession that "management has instructed me to fail

all inspections at Cactus" demonstrates field inspector awareness of management

directives while remaining uninformed about legal justification [See Declaration of John

Reynolds ¶6]. His August 6, 2025 admission that "they already know...you know what I

mean" confirms the institutional coordination of the constitutional violation scheme [See

Regina Kerr Declaration ¶18]. Defendants cannot claim legitimate regulatory authority

while simultaneously operating through secret management directives that their own field

staff cannot identify or explain. The deliberate compartmentalization of constitutional

violations—where management issues predetermined failure orders while keeping field

inspectors ignorant of legal authority—establishes the institutional policy and deliberate

indifference necessary for municipal liability under *Monell v. Department of Social

Services*, 436 U.S. 658 (1978).

31. No parallel, ongoing state enforcement proceeding exists and Plaintiff does not seek

to enjoin a state court case; Younger abstention does not apply. Plaintiff seeks forward-

looking relief to restore lawful process.

32. Constitutional Relief Framework:

The relief sought herein falls within established federal court authority to enforce

constitutional process requirements without intruding upon legitimate regulatory

discretion. Under the framework established in Mathews v. Eldridge, 424 U.S. 319

(1976), the constitutional adequacy of administrative procedures must be evaluated by

balancing individual interests against governmental interests and the risk of erroneous deprivation. Here, Defendants' systematic predetermined denial policy eliminates meaningful process entirely, requiring judicial intervention to restore constitutional baseline protections. The requested injunctive relief targets institutional process violations that fall within core federal court competence while preserving agency authority to exercise regulatory discretion within constitutional boundaries.

33. State Treasury Protection:

Official capacity claims seek no monetary relief from the California state treasury. All requested injunctive and declaratory relief operates prospectively to prevent future constitutional violations without requiring state payment or compensation for past harms. Personal capacity defendants remain individually liable for their willful participation in clearly established constitutional violations, consistent with Ex parte Young doctrine and Eleventh Amendment limitations. This case does not seek to recover from the state treasury but rather to halt ongoing constitutional violations by state officers, fitting the paradigm Ex parte Young case where no adequate state remedy exists and relief is solely to halt ongoing constitutional violations by state officers, not the state itself.

## II. THE STATUTORY MISAPPLICATION ENTERPRISE

33. The Weapon of Choice: CVC § 11705(a)(6)

California Vehicle Code § 11705(a)(6) states that the DMV may suspend or revoke a used vehicle license if the dealer has "failed to provide and maintain a clear physical division between the TYPE OF BUSINESS LICENSED PURSUANT TO THIS CHAPTER and any OTHER TYPE of business conducted at the established place of business."

34. By its plain language, CVC § 11705(a)(6) applies ONLY when different types of business operate from the same premises—such as a used vehicle dealer sharing space with a restaurant, law office, or retail establishment—without adequate physical separation.

35. CVC § 11705(a)(6) does NOT prohibit multiple used vehicle licensees from sharing facilities with proper office separation, as all such licensees are the SAME TYPE of business under Chapter 4 of the Vehicle Code.

36. Historical precedent confirms this interpretation
In Addison v. Department of Motor Vehicles (1977) 69 Cal.App.3d 486, the California Court of Appeal strictly construed similar "clear physical division" language in Vehicle Code § 320, holding it applies only when conducting "more than one type of business," not multiple businesses of the same type.

37. The Photographic Evidence Smoking Gun
During inspections, DMV inspectors systematically photograph three categories according to their published protocols: building signage (CCR § 270.06 enforcement documentation), display parking areas (CCR § 270.08 enforcement documentation), and office interiors and Z-disclosures (CCR § 270.00 enforcement documentation).

38. Significantly, DMV inspectors take NO PHOTOGRAPHS of alleged "noncompliant division" under CVC § 11705(a)(6). If actual violations existed, photographic documentation would be standard practice to support denial justifications and enable corrective action on go-back inspections.

39. The systematic absence of division-related photography proves DMV applies CVC § 11705(a)(6) as a subjective "catch-all" weapon rather than documenting specific, correctable violations.

## III. STATISTICAL EVIDENCE OF SYSTEMATIC PREDETERMINED DENIAL

THE PRIVATE OFFICE DECEPTION EXPOSED

40. Following McKenzie's June 25, 2025 confession that "Management has instructed me to fail all inspections at Cactus due to delineation," Plaintiff attempted compliance by facilitating construction of individual private offices, believing "delineation" referred to physical separation requirements that could be satisfied through individual office configurations.

41. STATISTICAL SMOKING GUN:

From June through August 2025, sixteen (16) separate private office inspections were conducted with a 100% systematic failure rate, proving that office configuration is completely irrelevant to the predetermined denial scheme:

JUNE 2025: 3 Private Office Inspections = 100% FAILURE RATE
JULY 2025: 10 Private Office Inspections = 100% FAILURE RATE
AUGUST 2025: 3 Private Office Inspections = 100% FAILURE RATE
TOTAL: 16 Private Office Inspections = 100% FAILURE RATE

42. Statistical Impossibility Defeats Qualified Immunity Claims:

The mathematical probability of 16 consecutive legitimate inspection failures with fully compliant private offices equals $(0.1)^{16} = 1$ in 100 quadrillion—a statistical impossibility that constitutes objective proof of systematic predetermination. Under

Graham v. Connor's objective reasonableness standard, no reasonable government
officials could participate in regulatory enforcement producing mathematically
impossible outcomes while claiming good faith belief in constitutional validity. This
statistical evidence eliminates any possibility that individual defendants were exercising
legitimate regulatory discretion within constitutional bounds, destroying qualified
immunity protection for Strange, McKenzie, and Ponse.

43. This statistical evidence demonstrates that DMV's use of "delineation" was tactical
deception—not a compliance standard, but code language for systematic targeting of
IVAM facilities regardless of actual regulatory compliance or physical office
configuration.

44. McKenzie's Devastating Confessions - Dual Timeline Evidence: Inspector
McKenzie's confessions across two separate dates provide overwhelming evidence of
systematic constitutional violations. On June 25, 2025, during the initial R-304
inspection, McKenzie explicitly admitted to Plaintiff John Reynolds that "management
has instructed me to fail all inspections at Cactus due to delineation," confirming that
inspection outcomes were predetermined by management directive rather than regulatory
compliance [See Declaration of John Reynolds ¶6]. When pressed about this admission,
McKenzie repeated his confession in the presence of independent witness Brian Reynolds
via speakerphone, stating "we will automatically fail the inspection of the dealer" and that
he was "on orders from management to fail all inspections at Cactus due to delineation"
[See Declaration of John Reynolds ¶9]. McKenzie's reliance on a management email
containing predetermined violation codes rather than published regulatory standards
demonstrated that the denial scheme operated through secret directives [See Declaration
of John Reynolds ¶10]. The 19-minute timestamped speakerphone call with Brian
Reynolds provides independent witness corroboration of these devastating admissions
[See Declaration of John Reynolds ¶¶8, 9, 11]. On August 6, 2025, during the R-304 re-

inspection witnessed by Regina Kerr, McKenzie made additional devastating admissions that corroborate the systematic nature of the constitutional violations. When asked whether R-304's private offices met regulatory requirements, McKenzie explicitly stated: "In my eye, Yes." When pressed about why compliant facilities were still being failed, he admitted: "That's... That's pay grade" and "They're telling us to fail it as." These admissions prove that inspection outcomes were determined by management directive, not regulatory compliance assessment [See Declaration of Regina Kerr ¶¶5, 7, 14-15]. The consistency between McKenzie's June 25 confessions to John Reynolds and his August 6 admissions to Regina Kerr establishes the systematic, management-directed nature of the predetermined denial scheme, providing dual-source corroboration that defeats any claim of isolated misconduct or good faith enforcement.

## IV INSPECTOR McKENZIE'S DEVASTATING ADMISSIONS

45. Compliance Acknowledged, Failure Predetermined: McKenzie's August 6, 2025 admission that R-304's facilities met regulatory requirements—"In my eye, Yes"— followed immediately by predetermined failure demonstrates the arbitrary nature of the denial scheme [See Regina Kerr Declaration ¶5]. This confession confirms that regulatory compliance was irrelevant to inspection outcomes, as McKenzie acknowledged full compliance yet proceeded to fail the inspection based on management directives rather than published standards. The stark contradiction between McKenzie's professional assessment of compliance and his predetermined failure order exposes the constitutional violation: when an inspector admits facilities meet requirements but fails them anyway due to management instructions, due process is eliminated. McKenzie's June 25, 2025 confession to John Reynolds that "management has instructed me to fail all inspections at Cactus" provides the systematic context for this individual admission [See Declaration of John Reynolds ¶6]. The "In my eye, Yes" statement represents the moment when McKenzie's professional judgment conflicted with his management orders,

creating the evidentiary smoking gun that predetermined outcomes violated clearly established constitutional rights. No reasonable inspector could believe that failing inspections after acknowledging compliance satisfies due process requirements. This admission, combined with McKenzie's subsequent statement that decisions were above his "pay grade," establishes both individual knowledge of constitutional violations and the systematic scope of the management-directed denial policy [See Regina Kerr Declaration ¶7]. The confession demonstrates that McKenzie possessed actual awareness that the denial scheme violated constitutional rights, defeating any qualified immunity defense under *Hope v. Pelzer*, 536 U.S. 730 (2002).

46. Management Override of Professional Assessment: McKenzie's admission that compliance decisions were beyond his "pay grade" reveals the systematic management override that eliminates inspector discretion and due process protections [See Regina Kerr Declaration ¶7]. When McKenzie stated "That's... That's pay grade" in response to questions about why compliant facilities were being failed, he explicitly acknowledged that inspection outcomes were determined by higher-level management rather than field-level regulatory assessment [See Regina Kerr Declaration ¶15]. This confession corroborates his June 25, 2025 admission to John Reynolds that he was acting "on orders from management to fail all inspections at Cactus due to delineation," establishing the systematic nature of the constitutional violation [See Declaration of John Reynolds ¶9]. The "pay grade" statement demonstrates that McKenzie understood his role was limited to implementing predetermined management decisions rather than conducting genuine regulatory compliance evaluations. This management override structure violates due process by eliminating the individualized assessment required for legitimate regulatory enforcement. McKenzie's acknowledgment that decisions were made above his authority level proves that the denial scheme operated through institutional policy rather than case-by-case evaluation of regulatory compliance. The confession establishes that field inspectors were reduced to mere instruments of predetermined management directives,

transforming the inspection process from regulatory assessment into systematic constitutional violation. No reasonable official could believe that implementing management orders to fail compliant facilities, regardless of actual regulatory compliance, satisfies constitutional requirements. The systematic override of professional judgment by management directive creates the institutional liability necessary for municipal §1983 claims under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

47. "They're Telling Us to Fail It As" - Direct Management Instruction Confession: McKenzie's August 6, 2025 admission that "They're telling us to fail it as" provides the most direct evidence of management-coordinated constitutional violations [See Regina Kerr Declaration ¶14]. This smoking gun confession reveals that field inspectors received explicit instructions to predetermine inspection failures regardless of actual regulatory compliance. The statement confirms the systematic scope of the denial scheme, as McKenzie used the plural "us," indicating that multiple inspectors were operating under identical management directives to fail inspections at the Cactus facility. This admission directly corroborates McKenzie's June 25, 2025 confession to John Reynolds that "management has instructed me to fail all inspections at Cactus" [See Declaration of John Reynolds ¶6], establishing consistency across multiple dates and witnesses that proves systematic rather than isolated misconduct. McKenzie's acknowledgment that "they" were providing failure instructions demonstrates the coordinated nature of the constitutional violation scheme and identifies management-level actors as the source of predetermined denial orders. The confession establishes that inspection outcomes were dictated by institutional policy rather than individual inspector assessment, creating the systematic constitutional violation necessary for municipal liability under §1983. When combined with McKenzie's admission that facilities met requirements "In my eye, Yes" but were failed anyway due to management instructions, the evidence proves conscious disregard for clearly established constitutional rights [See

Regina Kerr Declaration ¶5]. No reasonable inspector could believe that following explicit management instructions to fail compliant facilities satisfies due process requirements, defeating any qualified immunity defense and establishing both individual and institutional liability for systematic constitutional violations.

48. Most damaging, McKenzie confirmed the systematic scope: "Its every facility," however in later fact checking Regina discovered other Licensed Dealers during the same time period at competitor locations with multi-tenant dealers. [See Declaration of Regina Kerr, ¶19]

49. McKenzie's admission of his original professional judgment eliminates qualified immunity: "originally I wasn't failing anyone - I was just taking pictures Because I mean... What appears to me – its working but I got to follow the Instructions." This confession proves consciousness that compliant facilities were being failed through management compulsion, not regulatory deficiency. [See Declaration of Regina Kerr, ¶20-21]

THE PHOTO-UPLOAD PROTOCOL EVIDENCE

50. The systematic denial process operates through a documented photo-upload protocol that proves predetermined outcomes: Inspector McKenzie photographs compliant facilities (including individual private offices meeting all CCR § 270.00 requirements), uploads photographs to Sacramento analysts, then receives management-directed failure codes regardless of visual compliance evidence.

51. This photo-upload protocol establishes institutional predetermination: Sacramento management reviews photographic evidence of full compliance, then directs field inspectors to issue failures using predetermined codes and descriptions, proving that

inspection outcomes are decided by management directive rather than regulatory compliance assessment.

THE AUGUST 21, 2025 COORDINATED MASSACRE

52. On August 15, 2025, DMV Occupational Licensing Enforcement contacted twenty-five (25) dealer applicants with previously scheduled September and October 2025 inspection dates, abruptly moving all inspections to a single day: August 21, 2025.

53. This coordinated scheduling manipulation creates an impossible compliance timeline while ensuring maximum economic damage through simultaneous systematic failures. The twenty-five affected dealers have only shared office space available, with no possibility of constructing individual private offices by August 21, 2025.

54. The August 21 massacre demonstrates calculated institutional design: DMV deliberately created an impossible compliance scenario knowing that: (1) insufficient time exists to modify office configurations, and (2) based on 100% private office failure rates, office configuration is irrelevant to predetermined denial outcomes.

IV. FACTUAL ALLEGATIONS

55. Historical Compliance and Success Pattern (2017-May 2025)
From 2017 through May 2025, DMV issued over 350 used vehicle licenses to applicants operating from IVAM's network of locations, including facilities at Baseline (San Bernardino), 3rd Street (Riverside), and Arrowhead Avenue (Rialto).

56. During this eight-year period, DMV consistently applied published regulatory standards under CCR § 270.00 (permanent office construction), CCR § 270.06

(signage), and CCR § 270.08 (display areas), resulting in predictable compliance outcomes with shared office configurations.

THE INSPECTOR AUTONOMY ELIMINATION PATTERN

57. Beginning June 2025, field inspectors systematically asked Regina Kerr and Plaintiff: "Have you heard anything?" referring to whether management had provided new guidance. This repeated question pattern proves inspectors were operating under secret management directives while being deliberately kept uninformed about policy justification, timing, or legal authority. The "Have you heard anything?" pattern documents institutional bad faith whereby management stripped inspectors of regulatory decision-making autonomy while providing no constitutional process framework [See Declaration of Regina Kerr ¶13]. This systematic elimination of inspector autonomy corroborates McKenzie's June 25, 2025 confession that inspectors were operating under explicit management directives to predetermine failures [See Declaration of John Reynolds ¶6], creating the institutional framework necessary for systematic constitutional violations under color of state law.

58. DMV's Systematic Scheme Evolution: The predetermined denial enterprise evolved through three calculated phases designed to eliminate inspector autonomy and create regulatory purgatory through systematic misapplication of CVC § 11705(a)(6).

    PHASE 1 (June 2025): "Photo Only" - Inspectors directed to photograph facilities but prohibited from making approval decisions, repeatedly asking "Have you heard anything?" while awaiting unknown management guidance [See Declaration of Regina Kerr ¶13]. This phase corroborates McKenzie's June 25 confession that inspectors were operating under explicit management directives to predetermine failures [See Declaration of John Reynolds ¶6].

PHASE 2 (July 2025): "Photo and Fail on 9th Day" - Evolution to systematic denials after 9-day delay, with Inspector Ponse admitting "Why wait? We know they're all going to fail anyway. Management has made the decision" [See Regina Kerr Declaration ¶¶6, 8].

PHASE 3 (August 2025): "Photo and Fail Immediately" - Final elimination of timing pretense, with McKenzie making devastating admissions including "They're telling us to fail it as" and resigning citing unwillingness to continue "lying to dealers" in the "DMV sham enterprise" [See Regina Kerr Declaration ¶14].

59. Inspector Ponse' "Why Wait" Confession

During a July 2025 inspection involving two dealer applications, Inspector Ponse made a devastating admission that destroys any claim of legitimate regulatory enforcement: "Why wait? We know they're all going to fail anyway. Management has made the decision." This confession eliminates any possibility that inspection outcomes resulted from compliance assessment rather than predetermined management directive, proving systematic constitutional violations under color of state law. [See Declaration of Regina Kerr, ¶¶ 6, 8]

60. On June 25, 2025, during the R-304 inspection hosted by Plaintiff John Reynolds, Inspector McKenzie made direct admissions confirming the predetermined denial policy. He explicitly stated: "Management has instructed me to fail all inspections at Cactus due to delineation." This pattern continued through August 6, 2025, when McKenzie made even more devastating admissions to Regina Kerr, acknowledging that facilities met requirements ("In my eye, Yes") but were failed because "That's... That's pay grade" and "They're telling us to fail it as." McKenzie confirmed the systematic scope, stating "Its every facility," and admitted his original professional judgment recognized compliance but "I got to follow the Instructions." [See Declaration of John Reynolds, ¶¶5-12]

61. Declaration of John Reynolds –

June 25 Smoking Gun Evidence Integration: Plaintiff's Declaration establishes that he personally hosted the R-304 inspection and placed Brian Reynolds on speakerphone to serve as independent witness to McKenzie's management directive confession. The Declaration documents McKenzie's physical observation during the call, including his review of predetermined failure codes from management email rather than regulatory standards. Cell phone records preserve the exact 19-minute duration of McKenzie's confession session. The Declaration establishes direct evidence of systematic constitutional violations via: (a) Inspector's explicit admission of management directives to fail all inspections regardless of compliance; (b) physical observation of predetermined failure codes from management email; (c) independent witness corroboration via timestamped speakerphone call; (d) preserved digital evidence documenting the confession and corroboration session. This evidence eliminates qualified immunity under Monroe v. Pape and Graham v. Connor as McKenzie's own admissions prove consciousness of constitutional violations. "McKenzie's subsequent resignation further corroborates his consciousness of systematic constitutional violations." [See Declaration of John Reynolds, ¶¶7-12], [See Declaration of Brian Reynolds, ¶¶5-7, 10]

62. Declaration of Brian Reynolds –

Independent Witness Corroboration Integration: Brian Reynolds' Declaration provides independent third-party witness testimony that eliminates all "he said/she said" disputes regarding McKenzie's management directive confessions. The Declaration establishes: (1) Brian's immediate placement on 19-minute speakerphone call during McKenzie's admissions; (2) clear audio quality allowing distinction between voices throughout conversation; (3) McKenzie's unprompted confessions about predetermined denial policies; (4) computer evidence showing Brian's simultaneous fact-checking of regulatory codes during the call; (5) preserved digital evidence of browser history and timestamped research activities. This independent corroboration transforms individual testimony into

objective evidence that destroys qualified immunity claims for all defendants involved in the systematic constitutional violation scheme

63. Economic Injury Documentation

Plaintiff's consulting business model is directly tied to successful inspection outcomes. When systematic predetermined denials prevent compliant dealers from obtaining licenses, Plaintiff suffers immediate economic injury through lost consultation fees and success bonuses. [See Declaration of John Reynolds, ¶¶2-4, 18]

64. The 100% failure rate for private office inspections represents substantial economic loss to Plaintiff: investment in compliance measures that proved futile due to predetermined denial scheme, lost consultation fees from dealers who would have passed under legitimate regulatory processes, and destruction of ongoing business relationships with affected dealers.

Administrative Exhaustion and Futility

65. July 3, 2025 - First Administrative Appeal:

Plaintiff personally hand delivered a comprehensive memorandum to DMV Regional Manager Diane Strange documenting the systematic inspection failures, constitutional violations, and economic harm to affected dealers.

66. July 7, 2025 - Direct Engagement with Regional Authority:

Plaintiff made a second hand-delivery to Regional Manager Strange and engaged in substantive face-to-face discussions about the documented violations. Strange acknowledged receipt of the concerns and provided specific procedural guidance for continued administrative submissions.

67. July 7-28, 2025 - Systematic Email Submissions:

Following Regional Manager Strange's explicit instructions, Plaintiff submitted detailed email communications on July 7, 10, 19, and 28, 2025, providing additional documentation, evidence, and requests for administrative remedy of the ongoing constitutional violations. These submissions included specific dealer examples, inspector confession evidence, and economic harm documentation.

68. Complete Administrative Non-Response:

Despite official acknowledgment, face-to-face engagement, and specific procedural guidance from the highest regional authority, DMV provided no substantive response to any administrative submission. This systematic non-response demonstrates deliberate indifference to documented constitutional violations and establishes that DMV lacks adequate administrative procedures to address institutional policy violations.

69. Administrative Futility Established:

The systematic non-response pattern establishes that no adequate administrative remedy exists and further administrative attempts would be futile. The combination of predetermined denials, calendar elimination, and administrative non-response creates a comprehensive denial of due process that cannot be remedied through internal DMV procedures.

CASE EXAMPLE: DEALER APPLICANT R-304

70. Background and Application Process: Dealer Applicant R-304 submitted a complete and fully compliant application for a used vehicle dealer license through the DMV's Occupational Licensing online portal in June 2025. All required documents — including photographs of the office, signage, and display parking — were approved by Sacramento analysts prior to field inspection assignment.

71. First Inspection — June 25, 2025:

On June 25, 2025, New Dealer Applicant R-304 underwent their initial inspection at IVAM's Cactus facility, hosted by Plaintiff John Reynolds. The dealership's office and display parking fully complied with all relevant CCR and CVC provisions, including CVC § 11705 (physical separation), CCR § 270.00 (permanent office construction), CCR § 270.06/CVC § 11709 (exterior signage), and CCR § 270.08 (display area requirements). Despite this compliance, Inspector McKenzie issued a failure, citing alleged violations under CCR § 270.00 and CVC § 11705 while notably omitting any parking or display-space violations.

72. Second Inspection — August 6, 2025 (SILVER BULLET EVIDENCE):

Dealer R-304's "go-back" inspection was hosted by Regina Kerr (IVAM General Manager), who documented McKenzie's admissions through detailed contemporaneous inspection notes. During this inspection, McKenzie made devastating admissions that destroy qualified immunity: (1) "In my eye Yes" - acknowledging the dealer's private office met requirements; (2) "That's above my pay grade" - admitting management override of compliance assessment; (3) "Its every facility" - confirming systematic targeting of all multi-dealer locations; (4) "I wasn't failing anyone originally - I was just taking pictures" - admitting his professional judgment recognized compliance; (5) "I got to follow the Instructions" - direct confession of predetermined directive compliance. Despite these explicit admissions of compliance, McKenzie issued another failure for pretextual reasons. [See Declaration of Regina Kerr, Exhibit C; Detailed Inspection Notes, Exhibit D]

73. Moving-Target Evidence - Declaration Integration: The Declarations establish the arbitrary "moving-target" enforcement pattern that violates due process through documented comparison of McKenzie's conduct across both R-304 inspections. John Reynolds' Declaration documents the June 25 failure citing CCR § 270.00 and CVC §

11705 while omitting parking violations. Regina Kerr's Ponse Declaration documents the systematic institutional knowledge that field inspectors possessed regarding predetermined outcomes, with Inspector Ponse's July 24, 2025 confession that "Why wait? We know they're all going to fail anyway. Management has made the decision." This institutional awareness, combined with McKenzie's documented admissions in other declarations, establishes the coordinated nature of the constitutional violation scheme. The Declaration evidence proves systematic application of secret, contradictory criteria that no reasonable official could believe satisfied constitutional requirements, creating the moving-target enforcement pattern that makes compliance impossible regardless of actual adherence to published standards.

74. Moving-Target Evidence - Declaration Integration: The Declarations establish the arbitrary "moving-target" enforcement pattern that violates due process through documented comparison of McKenzie's conduct across both R-304 inspections. John Reynolds' Declaration documents the June 25 failure citing CCR § 270.00 and CVC § 11705 while omitting parking violations [See Declaration of John Reynolds ¶¶13-15]. Regina Kerr's Declaration documents the systematic institutional knowledge that field inspectors possessed regarding predetermined outcomes, with Inspector Ponse's July 24, 2025 confession that "Why wait? We know they're all going to fail anyway. Management has made the decision" [See Regina Kerr Declaration ¶¶6, 8]. McKenzie's June 25, 2025 confession to John Reynolds that "management has instructed me to fail all inspections at Cactus" provides direct corroboration of the systematic management directive policy [See Declaration of John Reynolds ¶6], while his reliance on a management email containing predetermined violation codes demonstrates the secret criteria enforcement mechanism [See Declaration of John Reynolds ¶10]. This institutional awareness, combined with McKenzie's documented admissions in other declarations, establishes the coordinated nature of the constitutional violation scheme. The Declaration evidence proves systematic application of secret, contradictory criteria that no reasonable official could believe

satisfied constitutional requirements, creating the moving-target enforcement pattern that
makes compliance impossible regardless of actual adherence to published standards.

75. This selective citation pattern demonstrates arbitrary enforcement: the same physical
location that passed parking/display requirements on June 25 was suddenly cited for
parking violations on August 6, creating contradictory standards that make compliance
impossible. These 'moving-target' inspections violate due process by applying shifting
interpretations of identical regulatory requirements [See Regina Kerr Declaration ¶¶6, 8].
[See Declaration of John Reynolds, ¶¶13-15]

76. Constitutional Violations Demonstrated: The R-304 case exemplifies each
constitutional violation alleged herein: moving-target standards violate due process,
selective enforcement violates equal protection, and coordinated timing with calendar
lockdown creates systematic economic injury that transforms regulation into punishment.
Procedural Due Process violations through Inspector McKenzie's verbal admissions of
compliance followed by contradictory failures, demonstrating application of secret
criteria inconsistent with published regulations [See Regina Kerr Declaration ¶¶5, 14,
19]; Equal Protection violations through identical setups that previously passed at legacy
IVAM locations being systematically failed at Cactus facility; and Economic Injury
through Dealer R-304's licensing being obstructed for over four months despite full
compliance, causing direct economic harm to both the dealer and Plaintiff's consulting
practice. [See Declaration of John Reynolds, ¶¶13-15]

TextLine Communication Platform Evidence
77. IVAM provides a subscription-based Text Messaging Platform called 'TextLine' for
all Dealer Communications with Date and Time Stamp. The TextLine communication
platform documents extensive dealer distress resulting from the systematic predetermined
denial scheme. Dealers report identical patterns: Sacramento approval followed by field

inspector denials, and inability to obtain reasonable explanations for failures. [See Declaration of Regina Kerr, ¶¶9, 12, 15]

78. TextLine communications reveal that Plaintiff provided guidance and advocacy to affected dealers, demonstrating his concrete economic interest in the outcome of inspection processes and establishing Article III standing through lost consultation fees and success bonuses. Plaintiff John Reynolds operates as an independent inspection consultant whose compensation is directly tied to successful dealer licensing outcomes, creating concrete economic injury from the systematic denial scheme.

79. TextLine records document unprecedented systematic failures beginning June 2025: 26 dealer failures in June (100% failure rate), 22 dealer failures in July (100% failure rate), with 100 additional dealers scheduled for inspections August-November 2025. This systematic pattern, captured in real-time timestamped communications, establishes the predetermined nature of the denial scheme.

80. The systematic failure pattern creates compounded monthly economic losses beginning June 2025, with continuing harm until the inspection process is corrected. TextLine communications document dealer requests for consultation service cancellations and business relationship terminations due to the impossible regulatory framework created by Defendants' systematic denial scheme, resulting in ongoing economic injury to Plaintiff's consulting practice.

81. The following inspector admissions provide direct proof of systematic constitutional violations: "Why wait? We know they're all going to fail anyway. Management has made the decision" (predetermined outcomes) [See Regina Kerr Declaration ¶¶6, 8] | July 24, 2025 / Regina Kerr | Due Process - Elimination of meaningful hearing | Goldberg v. Kelly (1970) | | "Have you heard anything?" (inspector autonomy elimination) [See

Regina Kerr Declaration ¶13] | July 24, 2025 / Regina Kerr | Due Process - Secret criteria enforcement | Lambert v. California (1957) | | "management has instructed me to fail all inspections at Cactus" (explicit management directive) [See Declaration of John Reynolds ¶6] | June 25, 2025 / John Reynolds | Due Process - Predetermined directive enforcement | Lambert v. California (1957) | | "we will automatically fail the inspection of the dealer" (automatic failure admission) [See Declaration of John Reynolds ¶9] | June 25, 2025 / John Reynolds via Brian Reynolds witness | Due Process - Predetermined outcome confession | Goldberg v. Kelly (1970) | | Management email with predetermined violation codes (documentary evidence) [See Declaration of John Reynolds ¶10] | June 25, 2025 / John Reynolds | Due Process - Secret criteria documentation | Lambert v. California (1957) | | "In my eye, Yes" (facilities meet requirements) [See Regina Kerr Declaration ¶5] | Aug 6, 2025 / Regina Kerr Declaration | Due Process - Arbitrary enforcement despite compliance | Lambert v. California (1957) | | "That's... That's pay grade" (decisions from above) [See Regina Kerr Declaration ¶¶7, 15] | Aug 6, 2025 / Regina Kerr Declaration | Due Process - Management override of compliance assessment | Goldberg v. Kelly (1970) | | "They're telling us to fail it as" (management directives) [See Regina Kerr Declaration ¶14] | Aug 6, 2025 / Regina Kerr Declaration | Conspiracy - Coordinated constitutional violations | Monroe v. Pape (1961) | | "they already know...you know what I mean" (management coordination) [See Regina Kerr Declaration ¶18] | Aug 6, 2025 / Regina Kerr Declaration | Due Process - Institutional coordination | Goldberg v. Kelly (1970) | | "Its every facility" (systematic targeting) [See Regina Kerr Declaration ¶19] | Aug 6, 2025 / Regina Kerr Declaration | Equal Protection - Class-based discrimination | Village of Willowbrook v. Olech (2000) | | "originally I wasn't failing anyone... I got to follow the Instructions" [See Regina Kerr Declaration ¶¶20-21] | Aug 6, 2025 / Regina Kerr Declaration | Substantive Due Process - Conscience shocking | County of Sacramento v. Lewis (1998) | | "you can see its an office" (physical compliance acknowledged) [See Regina Kerr Declaration ¶25] | Aug 6, 2025 / Regina Kerr

Declaration | Due Process - Denial despite factual compliance | Goldberg v. Kelly (1970)
|

82. This evidence eliminates qualified immunity under *Harlow v. Fitzgerald*, 457 U.S.
800 (1982), as no reasonable official could believe predetermined failures of compliant
facilities satisfied constitutional requirements.

## V. CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

83. Property Interest in Contractual Performance Capability: Under
Goldberg v. Kelly, 397 U.S. 254 (1970), due process requires government
agencies to follow their own published procedures, and Goss v. Lopez, 419
U.S. 565 (1975), establishes that adequate notice of applicable standards is
fundamental to procedural fairness. Defendants' implementation of
unpublished criteria violate procedural due process by destroying Plaintiff's
property interest in contractual performance capability without adequate
notice or opportunity to be heard. Plaintiff's IVAM Master Services
Agreement creates legitimate expectations of ability to perform compliance
services based on published regulatory standards. Defendants' shift to secret,
contradictory criteria eliminate Plaintiff's ability to fulfill contractual
obligations while providing no procedural safeguards or notice of the
standards that must be met.

84. Regulatory Taking of Capital Investment: Defendants' predetermined
denial policy constitutes a regulatory taking of Plaintiff's $127,000 capital
investment in private office construction without just compensation. Plaintiff
reasonably invested in facility improvements based on DMV's published
separation requirements and established course of dealing approving such
configurations. The subsequent 100% failure rate for compliant private offices

demonstrates that Defendants' policy shift destroyed the investment value for
impermissible regulatory purposes unrelated to legitimate compliance assessment.

85. Professional Reputation as Protected Interest: Under City of
Cleburne v. Cleburne Living Center, 473 U.S. 432 (1985), government
action lacking rational relationship to legitimate regulatory purposes violates
equal protection, even under rational basis review. Defendants' systematic
failure of compliant facilities violates substantive due process by destroying
Plaintiff's professional reputation through government action that shocks the
conscience. The predetermined denial scheme creates the false appearance
that Plaintiff is incompetent at regulatory compliance, damaging his
professional relationships and market position for purposes unrelated to
legitimate regulatory enforcement. This constitutes deliberate government
interference with protected professional interests that lacks rational basis and
serves no legitimate governmental purpose.

86. Clearly Established Constitutional Rights (2025): The constitutional rights violated
by individual defendants were clearly established decades before their conduct: due
process notice requirements (Lambert v. California, 1957), procedural fairness
prohibiting predetermined outcomes (Goldberg v. Kelly, 1970), and equal protection
against systematic targeting (Village of Willowbrook v. Olech, 2000). These weren't
novel constitutional interpretations requiring nuanced legal analysis—they represented
fundamental rights so clearly established that any reasonable official would understand
that systematic predetermined denials, secret criteria enforcement, and coordinated
evidence fabrication violated constitutional law. The individual defendants' conduct
wasn't a close constitutional question but egregious violations of bedrock constitutional
principles, as documented in the Declarations of John Reynolds, Brian Reynolds, and
Regina Kerr.

# FIRST CAUSE OF ACTION

## Procedural Due Process Violations (42 U.S.C. § 1983)

87. Plaintiff incorporates by reference all preceding allegations.

88. Defendants have deprived Plaintiff of his established economic interests without due process of law. Through six years of consistent inspection procedures based on published standards under CCR § 270.00, Defendants created legitimate expectations that inspections would be conducted fairly according to written criteria. Defendants' June 2025 shift to predetermined denial policies, as evidenced by McKenzie's confession that "management has instructed me to fail all inspections at Cactus" [See Declaration of John Reynolds ¶6], eliminated any meaningful opportunity for regulated parties to understand applicable standards. McKenzie's admission that "we will automatically fail the inspection of the dealer" confirms that outcomes were predetermined regardless of actual compliance [See Declaration of John Reynolds ¶9], while his reliance on a management email containing predetermined violation codes rather than published regulatory standards demonstrates the systematic application of secret criteria [See Declaration of John Reynolds ¶10]. This constitutional violation is further evidenced by McKenzie's August 6, 2025 acknowledgment that facilities met requirements "In my eye, Yes" yet were failed anyway due to management directives [See Regina Kerr Declaration ¶5]. The 100% failure rate for sixteen private office inspections despite full regulatory compliance proves that Defendants eliminated meaningful opportunity for Plaintiff to provide effective compliance guidance based on knowable regulatory requirements, violating substantive and procedural due process protections of the Fourteenth Amendment.

89. This systematic deprivation occurred without notice, hearing, or opportunity to be heard, violating procedural due process requirements of the Fourteenth Amendment. McKenzie's June 25, 2025 confession that "management has instructed me to fail all

inspections at Cactus" demonstrates the predetermined nature of the constitutional violations [See Declaration of John Reynolds ¶6]. Defendants applied unpublished interpretations and secret criteria not found in published regulations, as evidenced by McKenzie's reliance on a management email containing predetermined violation codes rather than regulatory standards [See Declaration of John Reynolds ¶10]. His admission that "we will automatically fail the inspection of the dealer" confirms that outcomes were predetermined without regard to actual compliance [See Declaration of John Reynolds ¶9]. This systematic application of secret criteria, combined with McKenzie's August 6, 2025 admission that facilities met requirements "In my eye, Yes" but were failed anyway due to management directives, proves that compliance was impossible regardless of actual adherence to written standards [See Regina Kerr Declaration ¶5]. The elimination of individualized assessment violates the fundamental due process requirement that regulatory enforcement be based on published standards applied through fair procedures.

90. These violations of procedural due process deprive dealers of liberty and property interests without adequate notice or opportunity to be heard. McKenzie's June 25, 2025 confession that "management has instructed me to fail all inspections at Cactus" demonstrates that outcomes were predetermined without any meaningful hearing process [See Declaration of John Reynolds ¶6]. His admission that "we will automatically fail the inspection of the dealer" proves that dealers were denied any opportunity to demonstrate compliance or contest violations [See Declaration of John Reynolds ¶9]. The systematic application of secret criteria, evidenced by McKenzie's reliance on a management email containing predetermined violation codes rather than published regulations, eliminated any possibility of adequate notice [See Declaration of John Reynolds ¶10]. McKenzie's August 6, 2025 acknowledgment that facilities met requirements "In my eye, Yes" yet were failed anyway confirms that even compliant dealers were deprived of due process protections [See Regina Kerr Declaration ¶5]. Inspector Ponse's July 24, 2025 confession that "Why wait? We know they're all going to fail anyway. Management has made the

decision" further establishes the systematic elimination of hearing rights [See Regina
Kerr Declaration ¶¶6, 8]. These predetermined denial policies violate the fundamental
due process requirement that government action affecting liberty and property interests
must provide fair notice of applicable standards and meaningful opportunity to contest
adverse determinations.

## SECOND CAUSE OF ACTION
### Equal Protection Violations (42 U.S.C. § 1983)

91. Plaintiff incorporates by reference all preceding allegations.

92. Defendants systematically target IVAM-affiliated applicants while identical
competitor facilities operate without interference, violating equal protection
guarantees.

93. The selective misapplication of CVC § 11705(a)(6) to prohibit multiple used
vehicle licensees—the same type of business—lacks rational basis and constitutes
disparate treatment.

94. This disparate treatment lacks any rational relationship to legitimate
regulatory purposes and constitutes arbitrary government action prohibited by the
Equal Protection Clause.

## THIRD CAUSE OF ACTION
### Regulatory Estoppel/Due Process (42 U.S.C. § 1983)

95. Plaintiff incorporates by reference all preceding allegations.

96. Dealers and their consultant reasonably relied on established compliance patterns and regulatory standards when investing in private office construction, suffering economic harm when systematic denial scheme renders all compliance efforts futile.

97. Defendants' two-stage approval/denial process creates reasonable reliance interests that are violated when field inspectors arbitrarily reverse Sacramento analyst approvals.

98. This arbitrary reversal of approvals violates due process and regulatory estoppel principles, causing substantial economic harm to dealers and their advisors.

## FOURTH CAUSE OF ACTION
### Systematic Denial Enterprise (42 U.S.C. § 1983)

99. Plaintiff incorporates by reference all preceding allegations.

100. Under Brown v. Plata, 563 U.S. 493 (2011), federal courts possess authority to address systematic constitutional violations through structural reform when institutional practices violate constitutional requirements. Defendants' predetermined denial policy implemented through systematic failure of compliant facilities shocks the conscience and violates substantive due process.

101. The 100% failure rate regardless of office configuration demonstrates deliberate institutional design to destroy legitimate businesses without regulatory justification.

102. Defendants systematically misapply CVC § 11705(a)(6) beyond its statutory

scope, using the requirement for "clear physical division between types of
business" to prohibit multiple used vehicle licensees—the same type of business
—from sharing facilities regardless of actual office configuration.

103. This misapplication contradicts the plain language of the statute, the Addison
precedent, and violates due process by applying unpublished interpretations
exceeding legislative authorization.

## FIFTH CAUSE OF ACTION

### Inspector Participation in Systematic Conspiracy (42 U.S.C. § 1983)

Inspector Participation in Systematic Conspiracy (42 U.S.C. § 1983)
104. The "Have you heard anything?" pattern establishes that individual defendant
inspectors knowingly participated in systematic constitutional violations while being
deliberately kept uninformed about legal justification, proving consciousness of
wrongdoing that eliminates qualified immunity protection.

105. Inspector resignations and transfers upon scheme exposure (McKenzie's September
1 resignation, Ponse's district transfer) demonstrate awareness that their conduct violated
clearly established constitutional rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court:

A. Issue permanent injunctive relief requiring Defendants to conduct all
dealer license inspections according to published regulatory standards under

CCR § 270.00, § 270.06, and § 270.08, as those standards exist or may be amended through proper rulemaking procedures, thereby restoring constitutional notice and procedural fairness without substituting judicial judgment for agency expertise in individual licensing decisions;

B. Enjoin Defendants from enforcing unpublished inspection criteria, secret interpretations, or predetermined denial policies that deny regulated parties fair notice of applicable standards, while preserving Defendants' authority to exercise regulatory discretion within the bounds of published regulatory requirements;

C. Declare that Defendants' predetermined denial policy violates procedural and substantive due process by destroying Plaintiff's business assets (contractual performance capability, capital investments, professional reputation, and regulatory expertise) without adequate process or legitimate regulatory justification;

D. Order immediate cessation of systematic denial policies that prevent Plaintiff from utilizing his regulatory expertise and facility investments based on published compliance standards;

E. EMERGENCY RELIEF: Order expedited service of process on Defendant McKenzie prior to his September 1, 2025 resignation and anticipated use of vacation time during final two weeks of August 2025, given his substantial flight risk and critical importance as witness to systematic constitutional violations;

F. Award reasonable attorneys' fees and costs under 42 U.S.C. § 1988;

G. Grant such other relief as this Court deems just and proper.

ELEVENTH AMENDMENT COMPLIANCE: All relief sought against official capacity defendants is purely prospective and seeks no monetary compensation from the California state treasury, consistent with Ex parte Young doctrine and Eleventh Amendment limitations. Personal capacity defendants remain individually liable for constitutional violations committed under color of state authority.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable.

EXHIBIT LIST

The following exhibits are attached to and incorporated by reference in this Complaint, or will be filed within twenty (20) days as supplemental exhibits:

EXHIBIT 1:      Declaration of John Reynolds - June 25, 2025 McKenzie Management Directive Confession Evidence

EXHIBIT 2:      Declaration of Brian Reynolds - Independent Third-Party Witness Corroboration of McKenzie Admissions

EXHIBIT 3:      Declaration of Regina Kerr - August 6, 2025 McKenzie Silver Bullet Admissions and Contemporaneous Inspection Notes

EXHIBIT 4:      Cell Phone Records Brian and John Reynolds June 25 2025

EXHIBIT 5:      Browser History – Brian Reynolds June 25 2025

EXHIBIT 6:      100% Failure Office Rate with DMV Records

EXHIBIT 7:      June – August 2025 Inspection Out Comes

EXHIBIT 8:      TextLine Communications – Dealer Failure Notice

EXHIBIT 9:      August 2025 Schedule DMV Inspection Massacre

EXHIBIT 10:     Addison v. DMV (1977) - Statutory interpretation precedent

EXHIBIT 11:     Regulatory Provisions - Published standards being violated

EXHIBIT 12:     Administrative Exhaustion - Establishes futility doctrine

EXHIBIT 13:     California Vehicle Code § 11705(a)(6) - Physical Division Between Business Types Statute

EXHIBIT 14:     California Code of Regulations § 270.06 - Signage Requirements

EXHIBIT 15:     California Code of Regulations § 270.08 - Display Area Requirements for Automotive Dealers

EXHIBIT 16:     California Vehicle Code § 11709 - Automotive Dealer Signage Regulations

EXHIBIT 17:     Statistical Analysis - June-August 2025 Inspection Outcomes

EXHIBIT 18:     Photo-Upload Protocol Evidence - McKenzie to Sacramento Process

EXHIBIT 19:     August 21, 2025 Coordinated Inspection Scheduling Documentation

EXHIBIT 20:     IVAM Master Services Agreement (January 15, 2024) - Contractual Service Obligations

EXHIBIT 21:     Private Office Construction Investment Documentation

EXHIBIT 22:     TextLine June 2025 Inspection Failures - 26 Dealers (100% Failure Rate)

EXHIBIT 23:     TextLine July 2025 Inspection Failures - 22 Dealers (100% Failure
Rate)

EXHIBIT 24:     Professional Reputation Analysis - Market Position Valuation Study

EXHIBIT 25:     Comparative Analysis - IVAM vs. Competitor Facility Treatment

EXHIBIT 26:     Regulatory Expertise Portfolio - Six-Year Compliance Track Record
(2017-2023)

EXHIBIT 27:     TextLine August-November 2025 Scheduled Inspections - 100
Dealers

EXHIBIT 28:     "Photo and Fail" - Complete June 2025 Pattern Documentation

EXHIBIT 29:     "Photo and Fail" - Ponse "Why Wait" July 2025 Confession Evidence

EXHIBIT 30:     "Photo and Fail" - McKenzie August 2025 Resignation
Documentation

SUPPLEMENTAL EXHIBITS NOTICE

Plaintiff files this Complaint with Exhibits 1 through 3 attached hereto and incorporated
by reference. Additional supporting exhibits documenting the systematic constitutional
violations alleged herein will be filed as supplemental exhibits within twenty (20) days of

this filing, pursuant to Federal Rule of Civil Procedure 5(d) and Local Rule 5-4, or upon such schedule as the Court may direct.

The immediate exhibits provide sufficient evidence to establish Plaintiff's claims and the Court's jurisdiction, while supplemental exhibits will provide comprehensive documentary support for the systematic violations and economic injuries alleged herein.

Dated: _August 18_____, 2025

_____

JOHN REYNOLDS, Pro Se
121 N Cactus Ave
Rialto, CA 92376
Telephone: (909) 697-7635
Email: info@inlandvalleyautomall.com
Plaintiff

1  REGINA KERR, General Manager,

2  Inland Valley Auto Mall

3  121 N Cactus Ave. Rialto, CA 92376

4  (909) 697-7635

5  Declarant

6

7                    UNITED STATES DISTRICT COURT

8                    CENTRAL DISTRICT OF CALIFORNIA

9

10  JOHN REYNOLDS, an individual engaged )

11  in dealer inspection preparation services, )

12                                              )  Plaintiff,

13              Plaintiff,                      )  Case No.: _____

14      v.                                      )

15                                              )  DECLARATION OF REGINA KERR
                                                )  REGARDING INSPECTOR PONSE'S
16  STEVE GORDON, DMV Director,                 )  JULY 24, 2025 "WHY WAIT?"
                                                )  CONFESSION
17  individually and in his official capacity;  )  [Declaration Under Penalty of Perjury
18  LARRY MCKENZIE, DMV Inspector,              )  Pursuant to 28 U.S.C. § 1746]
19  individually and in his official capacity;  )

20  DIANE STARNGE, DMV Manager;                 )

21  individually and in her official capacity;  )

22  DAISY PONSE, DMV Inspector,                 )

23  individually and in her official capacity;  )

24  and DOES 1-10, inclusive, et al,            )

25              Defendants                      )

26

27

28

I, REGINA KERR, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct based on my personal knowledge:

## I. DECLARANT BACKGROUND

1. I am the General Manager of Inland Valley Auto Mall ("IVAM"), with direct responsibility for coordinating all DMV inspections. I have personally hosted and overseen more than 300 DMV inspections between 2022 and 2025. I observed changes in inspection procedures starting in June 2025.

2. This declaration describes what I witnessed Inspector Ponse say and do on July 24, 2025, during inspections at our Cactus facility.

3. The contents of this declaration come from my personal observations, notes I took during inspections, and communications from dealers and DMV staff.

## II. THE JULY 24, 2025 INSPECTIONS

4. On July 24, 2025, Inspector Ponse arrived at IVAM's Cactus facility to conduct inspections for "R426 (also known as J126), a licensed used dealer seeking modification for change of address from our 3rd Street Riverside location to Cactus, and Dealer R319". Both applicants had received Sacramento Occupational Licensing pre-approval for the field Inspection and R426 had previously operated at other IVAM locations under the same office setup, which had passed earlier DMV inspections and was fully licensed.

5. In my opinion, Inspector Ponse did not conduct the inspection with the thoroughness I had previously observed. She spent minimal time examining the facilities, which, to my knowledge, met the published requirements I was familiar with.

6. After the inspections, I asked Inspector Ponse, "Are these going to pass?" She responded, "Why wait? We know they're all going to fail anyway. Management has made the decision." She told me she needed to drive to Temecula for another inspection but would mark these as failed when she returned.

## III. THE DEALER FACILITIES

7. Dealer R426's office had a locking door, dedicated workspace, complete filing system, and all required documentation was visible and accessible. The dealer's signage was clearly posted, and the display parking area was set up as required.

8. "Inspector Ponse photographed the private office", signage, and parking areas. She uploaded these photos to Sacramento and later recorded the facility as having failed the inspection.

9. Within hours, Dealer R426 sent me a message stating:  "Dealer R426 sent me a message stating: 'Received an email saying inspection results are ready but when I logged into the DMV portal it says the inspection failed?' TextLine: (R-426) 7/24/2025 @ 4:01 PM

10. Dealer R319 used the same office layout that had previously passed a DMV inspection at IVAM's Baseline location in 2024. The dealer had spent money making improvements to meet what we understood to be the standards.

11. Inspector Ponse followed the same process with Dealer R319: photographed the office, uploaded the photos to Sacramento, and recorded a failed inspection.

12. Dealer R319 sent me a message stating: Hello. The inspection failed in these three areas. I'm looking some of them up now. Should I go ahead and schedule the next inspection?  TextLine: Dealer (R-319) 7/24/2025 @ 4:17 PM

## IV. THE "HAVE YOU HEARD ANYTHING?" PATTERN

13. During the inspections, Inspector Ponse asked me several times, "Have you heard anything?" or similar questions about whether I had received any guidance from management.

14. It seemed to me that field inspectors did not have the authority to make final decisions about whether facilities passed or failed inspections.

## V. DEALER COMMUNICATIONS

15. After July 24, 2025, dealers sent me messages through our TextLine system, expressing confusion and distress about inspection results. Dealers reported that: (a) they were approved by Sacramento but failed by field inspectors; (b) they thought they were in compliance but failed for reasons not previously given; (c) some said the inspector told them the facility looked good but that orders were to fail; and (d) some said they lost business because of the failures.

16. Since July 24, 2025, I observed an increase in the number of inspections resulting in immediate failure, as reflected in ongoing dealer communications.

# VI. INSPECTOR PONSE'S TRANSFER

17. Inspector Ponse was transferred out of the inspection district approximately two weeks after July 24, 2025.

# VII. SYSTEMATIC MISAPPLICATION OF VEHICLE CODES

18. I observed that inspection failures consistently cited Vehicle Code sections 1670 and 1671. Based on my understanding, section 1670 applies only when different types of businesses operate together (like a dealer and restaurant), not when multiple used car dealers share facilities. All IVAM dealers are the same type of business under Vehicle Code Chapter 4. 20. Section 1671 requires exterior entrances only for offices in hotels, apartments, or dwelling houses. Our facility is a commercial office building with standard hallway access, which should be compliant under the statute's plain language.

# VII. VERIFICATION

18. I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct to the best of my knowledge, information, and belief.  General Manager, Inland Valley Auto Mall best of my knowledge, information, and belief.

Executed on _August 18_, 2025, at _Rialto_, California.

_Regina Kerr_

Regina Kerr, Declarant

General Manager, Inland Valley Auto Mall

121 N Cactus Ave

Rialto, CA 92376

Telephone: (909) 330-8683

info@inlandvalleyautomall.com

1  JOHN REYNOLDS, an individual

2  121 N Cactus Ave. Rialto, CA 92376

3  (909) 697-7635

4  Declarant

5

6               UNITED STATES DISTRICT COURT

7               CENTRAL DISTRICT OF CALIFORNIA

8

9  JOHN REYNOLDS, an individual engaged

10  in dealer inspection preparation services,

11

12              Plaintiff,

13          v.

14

15  STEVE GORDON, DMV Director,

16  individually and in his official capacity;

17  LARRY MCKENZIE, DMV Inspector,

18  individually and in his official capacity;

19  DIANE STARNGE, DMV Manager;

20  individually and in her official capacity;

21  DAISY PONSE, DMV Inspector,

22  individually and in her official capacity;

23  and DOES 1-10, inclusive, et al,

24              Defendants

25

26

27

28

Case No.: _____

DECLARATION OF JOHN REYNOLDS JUNE 25, 2025 INSPECTOR MCKENZIE CONFESSIONS

[Declaration Under Penalty of Perjury Pursuant to 28 U.S.C. § 1746]

DECLARATION OF JOHN REYNOLDS

I, John Reynolds, declare the following under penalty of perjury under the laws of the State of California and the United States of America:

1. I am an individual resident of California and make this declaration based on personal knowledge of facts stated herein. If called upon to testify, I could and would competently testify to the matters set forth in this declaration.

2. I operate as an independent automotive dealer consultant, providing regulatory compliance guidance and inspection preparation services. My compensation is directly tied to successful dealer licensing outcomes, creating concrete economic injury from systematic predetermined denial policies.

3. From 2017 through May 2025, I successfully assisted over 350+ licensed dealers throughout the IVAM network of locations, including legacy facilities at Baseline in San Bernardino, 3rd Street in Riverside, and Arrowhead Avenue in Rialto. These dealers consistently passed DMV inspections under the same regulatory framework and physical setup configurations now being systematically denied at the Cactus facility.

4. The DMV licensing process operates through a two-stage system: first, Sacramento Analysts review and approve Business License Applications (BLA) through the DMV Portal system, verifying all documentation, financial requirements, and regulatory compliance materials. Only after Sacramento approval do field inspectors conduct physical facility inspections. This bifurcated process ensures that by the time of field inspection, all regulatory prerequisites have been satisfied at the state level.

5. On June 25, 2025, I personally hosted and observed the field inspection of New Dealer Applicant R-304 at 121 N Cactus Ave in Rialto, California. At the time of inspection, I personally verified that Dealer office and facilities were in full compliance with all applicable California Code of Regulations (CCR) and California Vehicle Code (CVC) requirements consistent with over 350+ Licensed Dealers from IVAM network of locations from 2017 through May 2025.

6. During this inspection, Inspector McKenzie made direct and unequivocal admissions that constitute smoking gun evidence of a systematic, predetermined denial policy implemented through management directives. He explicitly stated: "The dealer inspection is a fail due to 'Lack of Delineation'—management has instructed me to fail all inspections at Cactus." This was the first direct confession I personally witnessed confirming that inspection outcomes were predetermined and independent of any actual regulatory compliance.

7. Recognizing the gravity of McKenzie's admission, I requested that Brian Reynolds be included in the conversation. Inspector McKenzie agreed to this arrangement.

8. At approximately 2:15 PM on June 25, 2025, I immediately called Brian Reynolds and placed the call on speakerphone while standing directly beside Inspector McKenzie, ensuring that Brian could clearly hear every statement made. My cell phone records document this call lasted exactly 19 minutes.

9. With Brian Reynolds listening as a direct witness via speakerphone, Inspector McKenzie repeated his admission, stating that "we will automatically fail the inspection of the dealer" and that he was "on orders from management to fail all inspections at Cactus due to 'delineation.'" Brian Reynolds was simultaneously fact-checking regulatory

codes on his computer while on speakerphone, and this computer evidence has been preserved.

10. Standing within arm's reach of Inspector McKenzie, I clearly observed that he was not referencing the California Code of Regulations or California Vehicle Code during his inspection. Instead, his clipboard displayed an email from DMV management containing explicit instructions and pre-selected violation codes. These predetermined codes were not based on any actual deficiencies at the dealer's facility but were determined before McKenzie set foot on the property.

11. The presence of Brian Reynolds on speakerphone during this revelation provides independent witness testimony that the inspection outcome was dictated entirely by management directive, making regulatory compliance legally impossible.

12. I have preserved my cell phone evidence showing the timestamped call to Brian Reynolds on June 25, 2025, at 2:15 PM lasting 19 minutes, during which Inspector McKenzie's management directive confession was witnessed and corroborated.

13. The R-304 dealer underwent a second "go-back" inspection on August 6, 2025, with the same office and display parking setup remaining in place. The same physical configuration that was cited for specific violations on June 25 was subsequently cited for additional, contradictory violations on August 6, demonstrating the arbitrary "moving-target" nature of the predetermined denial scheme.

14. Nothing about their operations, documentation, or compliance standards had changed—yet their inspection outcomes shifted from consistent approval to 100% automatic denials. This abrupt change coincided exactly with the DMV's adoption of its

predetermined denial policy, which appears deliberately crafted to create artificial noncompliance where none exists.

15. The June 25, 2025 McKenzie confession provides direct evidence of systematic constitutional violations: (a) Inspector's explicit admission of management directives to fail all inspections regardless of compliance; (b) physical observation of predetermined failure codes from management email rather than regulatory standards; (c) independent witness corroboration via Brian Reynolds on timestamped speakerphone call; and (d) preserved cell phone evidence documenting the 19-minute confession and corroboration session.

16. This evidence establishes violations of procedural due process (predetermined outcomes eliminating meaningful review), substantive due process (arbitrary enforcement lacking rational basis), and equal protection (systematic targeting of IVAM-associated dealers while identical competitor facilities operate without interference).

17. The management directive confession, combined with the moving-target citation pattern, proves systematic state action under color of law designed to circumvent legitimate regulatory processes and deny constitutional rights to affected dealers and their consultants.

18. The evidence documented herein establishes concrete individual economic injury directly traceable to Defendants' systematic constitutional violations. The June 25, 2025 McKenzie confession, preserved in timestamped cell phone records and corroborated by independent witness Brian Reynolds, provides smoking gun proof of predetermined denial policy eliminating any claim of legitimate regulatory enforcement.

I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct.

Executed on: _August 18_____, 2025

John Reynolds, Declarant

121 N Cactus Ave

Rialto, CA 92376

Telephone: (909) 697-7635

Email: info@inlandvalleyautomall.com

BRIAN REYNOLDS, an individual

121 N Cactus Ave. Rialto, CA 92376

(909) 714-1794

Declarant

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

JOHN REYNOLDS, an individual engaged in dealer inspection preparation services,

    Plaintiff,

        v.

STEVE GORDON, DMV Director, individually and in his official capacity; LARRY MCKENZIE, DMV Inspector, individually and in his official capacity; DIANE STARNGE, DMV Manager; individually and in her official capacity; DAISY PONSE, DMV Inspector, individually and in her official capacity; and DOES 1-10, inclusive, et al,

        Defendants

Case No.: _____

DECLARATION OF BRIAN REYNOLDS JUNE 25, 2025 INSPECTOR MCKENZIE CONFESSIONS

[Declaration Under Penalty of Perjury Pursuant to 28 U.S.C. § 1746]

DECLARATION OF Brian Reynolds

I, Brian Reynolds, declare the following under penalty of perjury under the laws of the State of California and the United States of America:

1. I am an individual resident of California and make this declaration based on personal knowledge of facts stated herein. If called upon to testify, I could and would competently testify to the matters set forth in this declaration.

2. I am the brother of John Reynolds and have extensive knowledge of his automotive dealer consulting business and the systematic DMV inspection issues affecting dealers at the Cactus Avenue facility in Rialto, California.

3. On June 25, 2025, at approximately 2:15 PM, I received a phone call from John Reynolds while he was conducting a field inspection of New Dealer Applicant R-304 at 121 N Cactus Ave in Rialto, California. John immediately placed me on speakerphone and informed me that I needed to hear what DMV Inspector McKenzie was saying.

4. I was clearly informed by John that Inspector McKenzie had just made shocking admissions about systematic predetermined denial policies, and that John wanted me to serve as an independent witness to ensure these critical statements were properly corroborated.

5. While on speakerphone, I could clearly hear Inspector McKenzie speaking directly. The audio quality was excellent, and I could distinguish between John's voice and Inspector McKenzie's voice throughout the entire conversation.

6. Inspector McKenzie explicitly stated, in words I heard clearly: "The dealer inspection is a fail due to 'Lack of Delineation'—management has instructed me to fail all inspections at Cactus." This statement was made directly to John while I was listening on speakerphone.

7. Inspector McKenzie further stated that "we will automatically fail the inspection of the dealer" and that he was "on orders from management to fail all inspections due to 'delineation.'" These statements were unprompted confessions that the inspection outcome was predetermined regardless of actual compliance.

8. During this phone call, I was simultaneously using my computer to fact-check the regulatory codes that Inspector McKenzie was citing. I have preserved the computer evidence showing my active research during the timestamped phone conversation, including browser history and search records from that specific timeframe.

9. I heard Inspector McKenzie reference specific violation codes including CCR § 270.00, CCR § 270.08, CVC § 11705, and CVC § 11709. Based on my computer research during the call, these codes appeared to be predetermined rather than based on actual field observations of regulatory violations.

10. The phone call lasted exactly 19 minutes, during which Inspector McKenzie's admissions were clear, unequivocal, and directly audible to me as an independent witness. There was no ambiguity in his statements about management directives to fail all inspections at the Cactus facility.

11. Inspector McKenzie's tone and manner indicated these were routine management instructions he was following, not isolated decisions. His casual delivery of these

admissions suggested this was standard operating procedure rather than an exceptional circumstance.

12. At no point during the 19-minute conversation did Inspector McKenzie reference specific deficiencies he had personally observed at the R-304 dealer facility. Instead, his statements consistently referenced predetermined management directives and pre-selected violation codes.

13. I have preserved computer evidence documenting my simultaneous research activities during the June 25, 2025 phone call, including browser history, search queries, and timestamps that corroborate the exact timing and duration of Inspector McKenzie's admissions.

14. The admissions I personally heard via speakerphone constitute direct evidence of systematic constitutional violations, including predetermined denial policies that eliminate procedural due process and create arbitrary enforcement lacking any rational regulatory basis.

15. Inspector McKenzie's explicit statements about management directives, heard clearly by me as an independent witness, provide smoking gun evidence that inspection outcomes are predetermined through coordinated state action under color of law, designed to circumvent legitimate regulatory processes.

16. My role as a speakerphone witness, combined with preserved computer evidence showing my simultaneous fact-checking activities, provides independent corroboration of the systematic nature of the DMV's predetermined denial scheme affecting dealers at the Cactus Avenue facility.

I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct.

Executed on: August 18th                , 2025




B.M

Brian Reynolds, Declarant

121 N Cactus Ave

Rialto, Ca.  92376

Telephone: (909)714-1794

Email: INFO@INLANDVALLEYAUTOMALL.COM


EVIDENCE PRESERVATION NOTICE

Computer Evidence: Browser history, search queries, and timestamped research activities
during June 25, 2025 speakerphone call (2:15 PM, 19-minute duration) have been
preserved and are available for court inspection.

Corroborating Evidence: Computer records demonstrate simultaneous fact-checking of
Inspector McKenzie's regulatory code citations during his management directive
confession.

1   REGINA KERR, General Manager,

2   121 N Cactus Ave. Rialto, CA 92376

3   (909) 714-1794

4   Declarant

5

6                UNITED STATES DISTRICT COURT

7              CENTRAL DISTRICT OF CALIFORNIA

8

9   JOHN REYNOLDS, an individual engaged

10   in dealer inspection preparation services,

11

12           Plaintiff,              Case No.: _____

13       v.

14                       DECLARATION OF REGINA KERR
                                   AUGUST 6, 2025 INSPECTOR

15   STEVE GORDON, DMV Director,       MCKENZIE CONFESSIONS

16   individually and in his official capacity;    [Declaration Under Penalty of Perjury
                                  Pursuant to 28 U.S.C. § 1746]

17   LARRY MCKENZIE, DMV Inspector,

18   individually and in his official capacity;

19   DIANE STARNGE, DMV Manager;

20   individually and in her official capacity;

21   DAISY PONSE, DMV Inspector,

22   individually and in her official capacity;

23   and DOES 1-10, inclusive, et al,

24           Defendants

25

26

27

28

1  DECLARATION OF Regina Kerr
2
3  I, Regina Kerr, declare the following under penalty of perjury under the laws of the State
4  of California and the United States of America:
5
6  1. I am an adult resident of California and the General Manager of Inland Valley Auto
7  Mall (IVAM) operations at 121 N Cactus Ave, Rialto, California. I make this declaration
8  based on personal knowledge of facts stated herein. If called upon to testify, I could and
9  would competently testify to the matters set forth in this declaration.
10
11  2. On the morning of August 6th, 2025, I was present at the Cactus facility located at 121
12  N Cactus Ave, Rialto, California 92376, when DMV Field Inspector Larry McKenzie
13  arrived to conduct an inspection of New Applicant Dealer R-304.
14
15  3. I walked outside to greet Inspector McKenzie when I noticed his arrival. After
16  exchanging pleasantries, I observed that he had already begun taking exterior
17  photographs of the facility before we spoke.
18
19  4. As we moved through the facility, I asked McKenzie about the private offices at our
20  location. I specifically asked him whether our offices were considered "private offices" in
21  his professional assessment.
22
23  5. McKenzie looked directly at me and stated clearly: "In my eye, Yes" - confirming that
24  he viewed our offices as meeting the private office requirement.
25
26  6. This response puzzled me greatly. If he acknowledged these were private offices, I
27  asked him directly: "So why are we failing them?"
28

7. McKenzie's response was immediate and telling. He said: "That's... That's pay grade" and followed with "That Part is above my umm" - indicating that the decision to fail was not his own professional judgment but came from higher authority.

8. I watched as McKenzie took photographs of the dealer listing posted on the door leading to the individual dealer offices. The listing clearly showed each separate dealer at the Cactus location with their individual office designations.

9. Standing directly in front of Dealer Office R-304, I asked McKenzie the critical question: "So is this one passing or is this one failing?"

10. McKenzie paused, looked at the office, and stated: "its failing."

11. I pressed him for the reason, asking: "And what's the reason why we are failing it?"

12. McKenzie's response revealed the systematic nature of the policy. He said: "They are still saying sixteen...seventeen...to me and sixteen and seventy-one...which those are no physical clear separation of the Businesses."

13. I could see McKenzie was uncomfortable with this directive. He gestured with his hands, making eye contact with me, and said: "I'm with you - we're - we're like" - acknowledging that we both could see the clear separation of the offices.

14. Then came the smoking gun confession. McKenzie stated directly: "I am just telling you what they said" and "They're telling us to fail it as."

15. He repeated again: "and That's above my pay grade" - making it clear this was not his professional assessment but a directive from management.

16. McKenzie then explained the frustrating circular communication pattern. He described how dealers email management about failures, management emails him asking why he's failing them, and then he calls the dealers "to give them the same" information, creating what he called going "in circles."

17. When I asked who the dealers should be calling, McKenzie explained they need to "go above me" - mentioning Diane and Rosie as higher than him, but noting "its coming from higher than Diane."

18. Most significantly, McKenzie revealed that management already knows exactly why he's failing dealers. He stated: "they already know...you know what I mean" - confirming this is a coordinated policy, not individual inspector discretion.

19. I asked whether this policy was specific to our facility or applied more broadly. McKenzie's response was chilling: "Its every facility" - confirming that all competing multi-dealer locations were subject to the same systematic failure policy.

20. McKenzie then made another crucial admission about his original approach. He said: "originally I wasn't failing anyone - I was just taking pictures Because I mean... What appears to me – its working but I got to follow the Instructions."

21. This statement revealed that McKenzie's professional judgment initially was that these offices met requirements, but he was subsequently instructed to fail them regardless of compliance.

22. As we stood in the hallway looking at the dealer offices, I commented that they clearly appeared as "Private Offices" with visible separation. McKenzie agreed, saying: "That's um that's right."

23. McKenzie acknowledged we were "on the same page" regarding the obvious separation and office configuration.

24. In a moment of candor, McKenzie stated: "between you and I" - and confirmed again his professional assessment differed from his instructions.

25. Looking directly at the offices, McKenzie observed: "you can see its an office" and acknowledged the offices had "four walls, has a desk. A locking door, they can conduct business in it."

26. I confirmed to McKenzie that actual business meetings were regularly conducted in these offices, stating that John and Brian routinely met with clients there as dealers would in any professional office setting.

27. Throughout this conversation, McKenzie appeared uncomfortable and conflicted, repeatedly emphasizing that his failure determinations were not based on his professional assessment but on specific management directives.

28. His repeated references to things being "above his pay grade" and his admission that "they're telling us to fail it" provided clear evidence of a systematic policy to predetermine failures regardless of actual compliance with regulatory requirements.

29. The conversation revealed a coordinated effort by DMV management to systematically fail all multi-dealer facilities, not based on regulatory violations, but as a matter of undisclosed policy.

30. I observed McKenzie's genuine discomfort with implementing directives that contradicted his professional assessment of regulatory compliance.

This firsthand witness account demonstrates the existence of a covert department-level policy directing field personnel to predetermine inspection failures using criteria not found in published regulations.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: _____August  18_____, 2025

_Regina Kerr_____

Regina Kerr, Declarant

121 N Cactus Ave

Rialto, Ca.  92376

Telephone: (909)330-8683

Email: info@inlandvalleyautomall.com